**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
LEA AUGUSTIN, GERARD AUGUSTIN,      :
THOMAS MCSORLEY, DONNA MCSORLEY     :
RICHMOND WATERFRONT INDUSTRIAL      : CIVIL ACTION
PARK, LLC                           :
                                    :
            Plaintiffs              : NO. 14-CV-4238
                                    :
        vs.                         :
                                    :
CITY OF PHILADELPHIA                :
                                    :
            Defendant               :
```

### MEMORANDUM AND ORDER

JOYNER, J.                                    **March 17, 2016**

This §1983 action is before the Court now for disposition of the Plaintiffs' Motion for Partial Summary Judgment.  For the reasons outlined in the pages which follow, the motion shall be granted.

### Factual Background

The plaintiffs here are all property owners and landlords in the City of Philadelphia.  Plaintiffs Lea and Gerard Augustin and Thomas and Donna McSorley are residential property owners and landlords, whereas Plaintiff Richmond Waterfront Industrial Park LLC is the owner and lessor of commercial property in the city. By their complaint which was filed in July 2014, Plaintiffs seek to challenge and enjoin the city-owned gas utility, Philadelphia Gas Works ("PGW"), from imposing liens on their properties for

unpaid utility bills incurred by Plaintiffs' tenants.  Plaintiffs aver that since the first notice which they received of PGW's intent to lien their real estate came shortly before the liens were actually imposed, and in many instances, years after the charges were incurred and the tenants departed, that procedure violates their constitutional rights to procedural due process of law under the Fourteenth Amendment.  Although the Complaint is captioned as a "Class Action Complaint," to date none of the plaintiffs has sought certification of this suit as a class action.  Rather, in addition to asking that partial summary judgment be entered declaring that the pre-lien notice afforded to them was constitutionally defective, Plaintiffs also ask the Court to establish a schedule for the filing of a class certification motion and for further proceedings to determine an appropriate remedy.

## Standards for Summary Judgment Motions

The principles guiding the determination of motions for summary judgment are clearly articulated in Fed. R. Civ. P. 56, subsection (a) of which states:

> A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

In all cases, the initial burden is on the party seeking summary

judgment to point to the evidence which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); United States v. Donovan, 661 F. 3d 174, 185 (3d Cir. 2011).

The court reviewing a motion for summary judgment should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Burton, supra,(citing Scheidemantle v. Sluppery Rock University, State System of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006)). The line between reasonable inferences and impermissible speculation is often "thin," but is nevertheless critical because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment."  Halsey v. Pfeiffer, 750 F. 3d 273, 287 (3d Cir. 2014)(quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382, n.12 (3d Cir. 1990) and Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 474 (3d Cir. 1985)).

Inferences must flow directly from admissible evidence.  Id. Further, an issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In any event, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant.  <u>Burton</u>, <u>supra</u>,(quoting <u>Jakimas v. Hoffman-LaRoche, Inc.</u>, 485 F.3d 770, 777 (3d Cir. 2007)).

## <u>Discussion</u>

As noted, it is the gravamen of Plaintiffs' complaint that PGW's method for liening their properties violated their rights to procedural due process.  For its defense, the defendant City/PGW asserts that the Due Process Clause does not require a pre-lien notice or pre-lien hearing before the imposition of a lien for unpaid municipal gas service and that the dictates of due process are satisfied by the procedures provided under the Municipal Claim and Tax Lien Law, 53 P.S. §7101, *et. seq*. ("MCTLA").

Plaintiffs brought this suit pursuant to Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. §1983, which states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress ...

The purpose of Section 1983 is to provide a civil cause of action to protect persons against the misuse of power possessed by virtue of state law and made possible because the defendant was cloaked with the authority of the state. <u>Mosley v. Yaletsko</u>, 275 F. Supp. 2d 608, 612 (E.D. Pa. 2003). To state a claim for relief in an action brought under §1983, Plaintiffs must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. <u>American Manufacturers Mutual Insurance Co. v. Sullivan</u>, 526 U.S. 40, 49-50, 119 S. Ct. 977, 985, 143 L. Ed.2d 130 (1999).

Thus, the first inquiry in any §1983 suit is whether the plaintiff has been deprived of a right "secured by the constitution and laws," and the first question in a due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty." <u>Sullivan</u>, 526 U.S. at 59, 119 S. Ct. at 989; <u>Baker v. McCollan</u>, 443 U.S. 137, 140, 99 S. Ct. 2689, 2692, 61 L. Ed.2d 433 (1979). A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies. <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393, 162 L. Ed. 2d 174, 189 (2005)(citing <u>Vitek v. Jones</u>, 445 U.S.

480, 493-494, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) and Wolff v. McDonnell, 418 U.S. 539, 556-558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)).

Property interests, on the other hand, are defined by existing rules or understandings that stem from an independent source such as state law; they are not created by the Constitution. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538, 105 S. Ct. 1487, 1491, 84 L. Ed. 2d 494 (1985) Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972).  To have a property interest, a person must have a legitimate claim of entitlement to it; a unilateral expectation will not suffice.  Id.  The Supreme Court has held that impairments to property rights that liens and attachments effect merit due process protection.  Connecticut v. Doehr, 501 U.S. 1, 12, 19, 111 S. Ct. 2105, 2113, 2116, 115 L. Ed. 2d 1 (1991).

It is only after finding the deprivation of a protected interest that the Courts consider whether the State's procedures comport with due process.  Lujan v. G & G Fire Sprinklers, 532 U.S. 189, 195, 121 S. Ct. 1446, 1450, 149 L. Ed. 2d 391, 398 (2001).  Indeed, it is an essential principle of due process that a deprivation of life, liberty or property be preceded by notice and an opportunity for hearing appropriate to the nature of the case.  Hamdi v. Rumsfeld, 542 U.S. 507, 533, 124 S. Ct. 2633,

6

2648-2649, 159 L. Ed. 2d 578 (2004); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S. Ct. 652, 656, 94 L. Ed. 865 (1950).  Further, the "root requirement" of the Due Process Clause has been described as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." Loudermill, supra, 470 U.S. at 542, 105 S. Ct. at 1493(quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971)).  For this reason, notice and an opportunity to be heard must be provided at a meaningful time and in a meaningful manner.  Hamdi, 542 U.S. at 602, 124 S. Ct. at 2649 (citing Fuentes v. Shevin, 407 U.S. 67, 80, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)).

Because the requirements of due process are "flexible and call for such procedural protections as the particular situation demands," the Supreme Court has declined to establish rigid rules for the resolution of whether the administrative procedures provided are constitutionally sufficient.  Wilkinson, 545 U.S. at 225, 125 S. Ct. at 2395 (quoting Morrisey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)).  In keeping with that philosophy, in those situations where a state must act quickly or where it would be impractical to provide pre-deprivation process, the Court has held that providing post-deprivation process may be enough to satisfy the requirements of the Due Process Clause.  Gilbert v. Homar, 520 U.S. 924, 930, 117

S. Ct. 1807, 1812, 138 L. Ed. 2d 120 (1997); National Amusements, Inc. v. Borough of Palmyra, 716 F.3d 57, 62 (3d Cir. 2013). However, in situations where the State feasibly can provide a pre-deprivation hearing before taking property, it generally must do so regardless of the adequacy of a post-deprivation remedy to compensate for the taking.  Zinermon v. Burch, 494 U.S. 113, 132, 110 S. Ct. 975, 987, 108 L. Ed. 2d 100 (1990).   Stated otherwise, "when pre-deprivation process could be effective in preventing errors, that process is required." Montanez v. Secretary, Pennsylvania Department of Corrections, 773 F.3d 472, 484 (3d Cir. 2014)(citing Burns v. Pa. Department of Corrections, 642 F.3d 163, 171-73 (3d Cir. 2011) and Higgins v. Beyer, 293 F.3d 683, 693-694 (3d Cir. 2002)).

To determine what procedural protections the Constitution requires in a particular case, a weighing and analysis of the governmental and private interests that are affected is warranted.  Such analysis "generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>Burch</u>, 494 U.S. at 127, 110 S. Ct. at 984; <u>Turner v. Rogers</u>, 564
U.S. 431, 131 S. Ct. 2507, 2517-2518, 180 L. Ed. 2d 452, 463-464
(2011); <u>Mathews v. Eldridge</u>, 424 U.S. 319, 334-335, 96 S. Ct.
893, 902-903, 47 L. Ed. 2d 18 (1976).

With these principles and standards in mind, we turn now to
examine the procedures which were employed by PGW for placing
liens on the plaintiffs' properties and which are being
challenged by the instant litigation.  We begin by observing that
it appears that the genesis of PGW's imposition of property liens
was the enactment of Act 201 in November, 2004, codified at 66
Pa. C.S.A. §1401, *et. seq.*  Section 3(a) of that Act, 66 Pa.
C.S.A. §1414(a) provides in relevant part:

> A city natural gas distribution operation furnishing gas
> service to a property is entitled to impose or assess a
> municipal claim against the property and file as liens of
> record claims for unpaid natural gas distribution service
> and other related costs, including natural gas supply, in
> the court of common pleas of the county in which the
> property is situated or, if the claim for the unpaid natural
> gas distribution service does not exceed the maximum amount
> over which the Municipal Court of Philadelphia has
> jurisdiction, in the Municipal Court of Philadelphia, ...

Over the course of several months in early 2005, PGW had a
number of meetings and discussions with a "Landlord Task Force"
which was comprised of representatives from the Greater
Philadelphia Association of Realtors, the Homeowners Association
of Philadelphia, the Pennsylvania Residential Owners Association
and small business investors and city residents in an effort to
reach some type of agreement regarding how to best use Act 201 in

9

such a way that would benefit PGW's customers and provide a
reasonable, albeit distasteful, process for landlords.
Initially, "PGW voluntarily agreed to delay implementation of the
landlord lien provision of Act 201 ... until approximately June
2005." (Declaration of John Grogan, Exhibit 1 [email from PGW
Vice President Steven Hershey to Landlord Task Force]). It was
from these meetings and discussions that the Landlord Cooperation
Program emerged such that for registered residential landlords
who cooperated fully with PGW's efforts to obtain access to
private property to make repairs and, where necessary, shut off
service to delinquent accounts, no liens would be imposed upon
their registered properties while they were in the program.
(Grogan Declaration, Exhibits 1, 7, 8, 11).

Thereafter, between 2005 and 2008, PGW "at times" placed
liens on properties owned by landlords using a "slightly
automated" but largely manual system.[1] (Plaintiff's Compendium
of Deposition Excerpts and Declarations in Support of Plaintiffs'
Motion for Summary Judgment, Exhibit 2, Deposition of PGW
Director of Credit and Collections Michelle Carter-Goldsmith, pp.

---

[1]  From our reading of the deposition transcripts in the record of this
matter, the Court understands "manual" to mean only that it is necessary for
some person to input the information necessary and to take the steps required
to file and/or record the liens for unpaid gas service with the Philadelphia
County Court of Common Pleas and/or Municipal Court. This is in contrast to
the "automated" LMS which is programmed to automatically undertake each of the
necessary steps to accomplish the filing and/or recording of the gas service
liens and to interface with other systems both internal and external to PGW,
such as the Philadelphia County Courts and offices. (See, e.g., Grogan
Declaration, Exhibit 3, p.9 of 44).

20-22, 43-44).

In 2009, PGW rolled out a computerized system for
automatically liening real estate, called the "LMS" or "Lien
Management System," which had as its goal the processing of some
200-300 liens per day more quickly, inexpensively and with fewer
human errors than the "manual" method.  (Plaintiff's Compendium,
Exhibit 1, Deposition of Devin Courtney, PGW IT Services
developer, at pp. 21-24, 37-42; Exhibit 2, p. 43).  Presently,
LMS is fully automated, although there are means by which human
interventions may be manually input.[2]  (Pl's Exhibit 1, p. 39).
Now, at a certain point each month, the LMS automatically trolls
the account data in PGW's Customer Billing and Collections
database ("BCCS")[3] to identify accounts as being "lien eligible"

---

[2]   Such interventions include selecting certain "exceptions" in the LMS
system to prevent the property from being liened.  Where, for example, a
landlord is registered in the system as participating in the Landlord
Cooperation Program ("LCP"), where the customer is designated as being in the
Customer Responsibility Program ("CRP"), *i.e.*, they are low income, where a
customer has some type of medical condition such that PGW cannot turn off
service or where payments are made or billing amounts are adjusted after LMS
has already flagged an account as lien eligible, it will be necessary for
someone in the business department to intervene and make an adjustment into
the system to prevent the pre-lien notices from being mailed and the liens
sent through to the Prothonotary. (Exhibit 1, pp. 47-48, 51-52).  Likewise, if
PGW should determine that a lien was improperly placed, someone in the
crediting collections department could manually employ the vacate lien
function of LMS.  (Exhibit 1, pp. 76-77).

[3] In addition to the "exceptions" that can be utilized in the LMS
system, there are "blockers" which can be put on an account in the BCCS system
to prevent an account from being liened.  (Exhibit 2, pp. 28-29).  Generally
speaking, blockers in the BCCS application will prevent liens from going
through both the automated system and the manual system.  (Exhibit 1, p. 229).
The exceptions are a subset created for the lien application itself (*i.e.*,
LMS).  While they can block an account from being liened automatically, they
can also be overridden manually.  (Exhibit 1, p. 229).  Thus, while similar,
there are some blockers which are not exceptions, and some exceptions which
are not blockers.  (Exhibit 2, pp. 31-32).  For instance, additional blockers

based upon the size of the arrears and the length of time the arrearage has been outstanding. (Pl's Exhibit 1, pp. 21, 51-52, 99). For example, in the case of a typical residential account, once there is an arrearage of more than $300 and more than 91 days have elapsed since the last payment, it is considered to be eligible for liening and an automated pre-lien notification letter sent to the owner of the real estate.[4] (Pl's Exhibit 2, pp. 21-22).

Presently, there are at least 7 different "lien models" provided for in the LMS System, which determine when a lien is selected to be or may be filed against a property. (Pl's Exhibit 2, pp. 15-16). These models are subdivided into models governing when to lien a commercial property and when to lien a residential property, and are categorized by such variables as the length of time the account has been in arrears, the amount of the arrearage, whether the account or service agreement has been closed and/or written off, whether the gas service to the property has been terminated and whether the property has been recently sold. (Pl's Exhibit 2, pp. 17-22). From time to time,

_____

might arise where the customer has entered into a negotiated payment arrangement for the overdue account or where there is a "name mismatch" such that the owner's name and the property user's name are not the same. (Exhibit 1, pp. 117-120). Thus, BCCS data follows the customer; LMS data follows the property. (Exhibit 2, p. 69). Further, there are different blockers and exceptions available for residential and commercial properties. (Exhibit 2, pp. 38-39).

[4] That is, unless of course, there is a blocker or exception which has been applied as discussed in more detail, *infra*.

these models have been changed, but neither the models themselves
nor the changes to the models have ever been made public.  (Pl's
Exhibit 2, pp. 41-42).

If there are no lien "blockers," then the system will
commence the liening process which starts with the sending of an
automated pre-lien notice letter.  (Exhibit X to Defendant's
Motion for Summary Judgment, at p. 89).  Once a pre-lien letter
is sent, unless the amount indicated in the letter is paid within
the time period provided, the LMS automatically sends the lien
information to the office of the Prothonotary and the lien is
recorded against the property.  (Pl's Exhibit 1, pp. 82, 117-
120).  It is apparently not uncommon for a pre-lien and a
subsequent post-lien notification letter to be sent to the
service address (*i.e.*, the address at which service is provided
and the property which is liened) rather than the
landlord/property owner's registered mailing address, despite the
fact that this address is what must be listed on the landlord's
rental license.  (Pl's Exhibit 1, pp. 122-124; Pl's Exhibit 8).
Prior to November 2012, LMS was programmed to provide a period of
11 days from the time a pre-lien letter was sent to the time that
properties were liened; since that time, 30 days' notice is now
afforded.  (Pl's Exhibit 1, pp. 82-84; Pl's Exhibit 2, pp. 38-
40).  LMS automatically creates a file which is uploaded to PGW's
contracted mailing company, KUBRA, and KUBRA then actually mails

out both the pre-lien notices and the subsequent letters informing property owners that their real estate has been liened by PGW via the U.S. Mail.  (Pl's Exhibit 1, pp. 91-95; Grogan Declaration, Exhibit 3).

If however, there are blockers on the account, the liening process is suspended until such time as the blockers are removed, after which any debt on the account can be liened. (Pl's Exhibit 2, pp. 97-99, 142-144).  A customer can continue to receive service and accrue debt on his or her account while a blocker is in place; a blocker will only operate to forestall the sending of notice and the placement of a lien on the property where the service was provided.  (Pl's Exhibit 1, pp. 125-128, 129-134, 218-219, 221; Pl's Exhibit 2, p. 63).

Among the blockers which can prevent a property from automatically being liened is the "name mismatch" and "address mismatch" blockers, which arise where the name on the delinquent account and the service address listed in the BCCS does not match with the name and/or address identified as belonging to the property owners in the City of Philadelphia's Office of Property Assessments ("OPA") database.[5]  Although these properties can be liened manually, it is not uncommon for this blocker to delay the pre-lien notices from being sent for years, all while the account

_____

[5]   The Office of Property Assessment used to be called the Board of Revision of Taxes (or "BRT").  Pl's Exhibit 1, pp. 30, 77-78).

14

arrearages continue to grow.  (Pl's Exhibit 1, pp. 79-80, 119-157; Pl's Exhibit 2, pp. 54-56).

Exceptions function similarly - where an account is on the exceptions list, the issuance of a lien is delayed until such time as the exception is no longer applied, although debt can continue to accumulate. (Pl's Exhibit 2, pp. 56-57, 63).

Often, debt accumulates over many years[6] as a result of PGW continuing to provide gas service on an account. (Pl's Exhibit 2, pp. 63, 70-74; Deposition Testimony of Ramya Rajan, Plaintiff's Compendium of Exhibits at Exhibit 4, pp. 63-65, 71, 98-99).  In such situations and where the customer is not the property owner but is instead a tenant of a landlord, the landlord is not told that the customer is not paying his gas bills unless they are specifically authorized to receive this information or are a third-party designee on the account.  (Pl's Exhibit 2, pp. 63-64; Pl's Exhibit 4, p. 169).  As a result, landlords are often unable to take any action to prevent large liens from being assessed against their properties and are unable to recoup those funds from tenants who have long since vacated their properties,

_____

[6]  Although it is ostensibly PGW's current "rule" to not lien debt which is older than four years, the record reflects that this rule is not always followed insofar as PGW has liened properties for debts as old as 10 years and has taken the apparently contradictory position that so long as a property has not changed hands, it can lien it at any time. (Exhibit 2, pp. 66-74,161-162; Exhibit 4, pp. 69-72, 90-99, 101-104, 130-134; Plaintiff's Exhibit 10, Declaration of David Wolf, ¶s 5, 8).

frequently without paying their rents either.[7]  (Pl's Exhibits 8, 9, 10; Def's Exhibit A, pp. 39-43, 78-79, 89; Def's Exhibit H, pp. 55-58; Def's Exhibit M, pp. 118-119).

Nor is a landlord given notice if a customer with an arrearage moves to a new address and obtains gas service at the situs of the new location.  (Pl's Exhibit 2, p. 133).  Likewise, PGW does not inform landlords if or when a customer who has an outstanding balance on an old account moves to a new address and is required to make a security deposit with PGW to ensure payment.  (Pl's Exhibit 2, pp. 13-14).  Moreover, PGW does not require the customer to pay the outstanding balance in full as a pre-requisite to obtaining gas service at the new address; it merely opens a new service agreement and allows the arrearage to remain on the old service agreement for the previous address. (Pl's Exhibit 2, pp. 133-134).  If and/or when payments are made by the customer, PGW distributes the payment throughout the customer's account, meaning that some portion of the payments are credited to the arrearage, although how those payments are

_____

[7]  This is what happened to the named Plaintiffs in this case.  Lea and Gerard Augustin own two properties which were liened repeatedly for unpaid tenant bills during the period 2009-2012.  Those liens total over $19,500 on one property and approximately $17,000 on the other.  (Pl's Exhibit 8; Def's Exhibit M, p. 54).  In the case of Thomas and Donna McSorley, two liens were assessed against a rental property which they own on Griffith Street in the amounts of $1,066.79 and $1,144.31.  (Pl's Exhibit 9).  Finally, Plaintiff Richmond Waterfront Industrial Park received notices on October 31, 2012 that PGW was placing liens in the amount of $3,553.72 and $27,447.86 on its commercial property located at 4701 Bath Street.  The latter, larger lien was attributed to a PGW indebtedness dating back to June 2003.  (Pl's Exhibit 10).

allotted is unclear. (Pl's Exhibit 2, 134-135).

        In fact, it's reasonably easy for a tenant to obtain gas service from PGW regardless of whether they have a balance from a prior address.  (Deposition of Tiffany Higgins, Plaintiffs' Compendium of Exhibits, Exhibit 6, p. 21).  All the tenant needs to do is call PGW and give them their new landlord's name and telephone number, the lease start date and the location of the property where the gas will be provided, although PGW "may require documentation to try to determine could they possibly be responsible for that balance at the property they're moving to as well."  (Exhibit 6, pp. 21-24).  PGW does not normally try to capture the landlord's mailing address at the time the tenant applies for service.  (Exhibit 6, p. 24).

        Further, unless the landlord is in the Landlord Cooperation Program[8], no notification is provided to the landlord when PGW sends a delinquency or shut-off notice to a customer.  (Pl's Exhibit 2, p. 64).  The benefits afforded by membership in the LCP, are that, so long as they remain "cooperative," landlords'

_____

        [8] There is scant evidence how the Landlord Cooperation Program, which is available only for residential landlords, is publicized or advertised by PGW. Although Orlando Rosario, who oversees the operation of the LCP and the more recently-created Commercial Lien Notification Program testified that several ads regarding LCP were run in newspapers, on the radio, a few national magazines and some community newspapers like the Northeast Times, Metro and Girard News, he didn't know when or how often those advertisements appeared. There is no evidence in the record suggesting that this information is in any way still being publicly disseminated, aside from a tab on PGW's website. (Defendant's Exhibit Q, pp. 54-56; Defendant's Exhibits R-V).  Both Plaintiffs Thomas McSorley and Lea Augustin testified that they learned of the program only after they called PGW's offices questioning pre-lien notices they had received for their properties.  (Def's Exhibit H, pp. 46-49; Def's Exhibit M, pp. 46-47).

properties will not be liened and they can receive notification when a tenant has directed PGW to shut off an account thereby possibly "skipping out" on a lease.  (Deposition Testimony of Orlando Rosario, Plaintiff's Exhibit 5, pp. 98-99).  To become a participant in the LCP, a property owner must have an active rental license with the Philadelphia Department of Licenses and Inspections and must enroll online.  An email account is also required as all notices and communications are via email.  (Pl's Exhibit 5, pp. 90-92; Def's Exhibit M, pp. 48-49).  Hence, if a property owner does not have access to a computer, they are foreclosed from participation.  (Id.)

The LCP also requires complete cooperation on the part of the landlord; determination of whether or not a particular landlord is cooperative is made solely by PGW, usually automatically by the computer system.  (Pl's Exhibit 1, p. 71; PL's Exhibit 5, p. 97-98).  As a result, if a landlord fails to respond to any of PGW's emails, fails to provide access to his or her property or fails to appear for an appointment, they are automatically deemed to be uncooperative and expelled from the program, also without notice.  (Pl's Exhibit 1, 69-71; Def's Exhibit M, pp. 48-49; Def's Exhibit Q, p. 65).  By PGW's own admission, this happens "constantly" and typically results in at least one complaint a day.  (Pl's Exhibit 5, pp. 98, 133).

LCP is far from perfect in other respects as well.

Presently, some 3-4 times per month, PGW is confronted with
situations where even properly-enrolled landlords have had liens
placed on their properties for unpaid tenant gas bills and it
handles disputes about whether or not a landlord has been
cooperative on a daily basis.  (Pl's Exhibit 5, pp. 130-131;
Def's Exhibit Q, pp. 67-68). Additionally, there are frequent
errors in the amounts of the liens placed, which requires the
original lien to be manually removed and then replaced by a lien
for a valid amount. (Pl's Exhibit 5, 132-133).

In the last few years, PGW has also offered a Commercial
Lien Notification Program for commercial landlords.  However this
program, which has many of the same requirements[9] as LCP, does
not protect a property owner from having liens placed against his
property when the property is registered but rather only affords
the commercial landlord with an additional 30 days' notice before
a lien is imposed.

Even after a landlord receives notice that a lien has been
or is about to be placed against his real estate, PGW will
disclose little, if any information.  Indeed, for those landlords
who endeavor to learn why PGW has placed a lien against their
property, it is PGW's policy that its delinquent customers are

---

[9]  As with LCP, enrollment in the Commercial Lien Notification Program
("CLNP") is accomplished online, and requires the landlord to have a
commercial license issued by L & I and full and complete cooperation with PGW.
As with LCP, the determination that a landlord has sufficiently cooperated is
made by PGW in the exercise of its sole discretion.  (Def's Exhibit Q, pp.
137-139; Def's Exhibit Y).

entitled to privacy, even from the landlords whose property
interests are in danger of being impaired by their non-payment.
(Pl's Exhibit 2, pp. 64; Pl's Exhibit 3, pp. 57; Pl's Exhibit
10).  It will not give the property owner any information about
which tenant incurred the indebtedness or over what period of
time the debt was amassed.  (Pl's Exhibit 1, pp. 58-62; Pl's
Exhibits 8, 9, 10; Def's Exhibit M, pp. 54, 57-61; Def's Exhibit
H, pp. 57-58).  When a property owner asks what remedies he or
she might have to contest the placement of the lien, PGW
instructs them that they can file a complaint with the
Pennsylvania Public Utility Commission ("PUC"), an entity that
has repeatedly taken the position that it has no jurisdiction to
act in matters which arise under the Municipal Claim and Tax Lien
Law.  (Pl's Exhibit 4, p. 129, Pl's Exhibits 8, 10; Def's Exhibit
M, p. 58; Def's Exhibit P).

In light of all of the foregoing, we are constrained to
agree with the Plaintiffs that PGW's procedure for liening
property is, in the case of non-customer landlords,
constitutionally inadequate.  First, since the Supreme Court's
decision in Connecticut v. Doehr, 501 U.S. 1, 12, 19, 111 S. Ct.
2105, 2113, 2116, 115 L. Ed. 2d 1 (1991), there is no question
but that the placement of a lien and/or an attachment against
real estate constitutes a sufficient taking of property so as to
warrant due process protection.  See also, Peralta v. Heights

Medical Center, Inc., 485 U.S. 80, 85, 108 S. Ct. 896, 899, 99 L.
Ed. 2d 75 (1988)(lien encumbers property and impairs owner's
ability to mortgage or alienate it and state procedures for
creating and enforcing such liens are subject to the strictures
of due process).  Accordingly, we must next consider the process,
if any, that is afforded in conjunction with such takings in this
case and assess its constitutionality under the rubric outlined
in Matthews v. Eldridge.

     In so doing, we first find that the private interests
affected by the actions of PGW are the rights of individual
property owners to hold title to their real estate free and clear
of all outside municipal liens such that they remain free to
transfer, alienate, re-mortgage or sell their land and receive
the full proceeds in exchange therefor.  For its part, the City
arguably has an interest in predictable municipal finances and
recovery for municipal services rendered.  See, City of
Philadelphia v. Perfetti, 2015 Pa. Commw. LEXIS 237, 119 A.3d
396, 401 (2015).

     Turning next to the procedure provided under Pennsylvania
law, we note that after a municipal claim is filed, there are
three procedural alternatives available under the MCTLL.  First,
"the owner may contest the municipal claim or the amount of the
claim by filing and serving a notice to issue a writ of *scire*

*facias*,[10] thereby forcing a hearing on the municipal claim." Second, "the municipality may pursue a writ of *scire facias* without the owner's action;" or third, "the owner and the municipality may choose not to do anything, thereby letting the municipal lien remain recorded indefinitely subject to its revival every twenty years upon issuance of a suggestion of nonpayment and an averment of default." North Coventry Township v. Tripodi, 2013 Pa. Commw. LEXIS 50, 64 A.3d 1128, 1133 (Pa. Cmwlth. 2013); Penn Township v. Hanover Foods Corp., 2004 Pa. Commw. LEXIS 306, 847 A.2d 219, 223 (Pa. Cmwlth. 2004); Borough of Ambler v. Regenbogen, 713 A.2d 145 (Pa. Cmwlth. 1998); 53 P.S. §§ 7183, 7184.

It has been said that the purpose of a *scire facias* proceeding is to warn the property owner of the existence of a claim so that the owner may have an opportunity to make any defenses known and show why the property should not be under judicial subjection of a municipal lien. North Coventry, supra, (citing Newberry Twp. v. Stambaugh, 848 A.2d 173 (Pa. Cmwlth. 2004) and Muhlenberg Twp. Authority v. Fisher, 94 Pa. Commw. 351,

---

[10] "A writ of *scire facias* sur municipal claim is a writ used to enforce payment of a municipal claim out of the real estate upon which such claim is a lien." Valley Forge Sewer Authority v. Hipwell, 2015 Pa. Commw. LEXIS 355, 121 A.3d 1164, 1165, n.1 (Pa. Cmwlth. 2015)(quoting Fox Chap Sanitary Authority v. Abbott, 34 Pa. Cmwlth. 637, 384 A.2d 1012, 1013, n.1 (Pa. Cmwlth. 1978)). It is a statutory action *in rem*. The term *scire facias* refers to both the writ and the proceeding. Roethlein v. Portnoff Law Associates, 623 Pa. 1, 81 A.3d 816, 818, n.3 (2013). The issuance of a writ of *scire facias* is an original process and serves the dual purposes of a writ of summons and a complaint. Hanilton Township v. Hensco, Ltd., 97 A.3d 865 (Pa. Cmwlth. 2014).

503 A.2d 1022 (Pa. Cmwlth. 1986)).  Proper defenses to the writ
include actual payment of taxes, a defective claim or lien,
fraud, or lack of process or notice.  In a *scire facias*
proceeding, the trial court ultimately determines the appropriate
amount of the lien, including any interest or costs.  Valley
Forge v. Hipwell, supra, 121 A.3d at 1166, n.3.(citing Radhames
v. Tax Review Board, 994 A.2d 1170, 1178 (Pa. Cmwlth. 2010)).

From this, it is clear that Pennsylvania law does indeed
afford some due process procedures for challenging the validity
of gas liens **after** the liens have been levied against the
properties where the gas was provided.[11]  As previously noted,
however, this does not end the inquiry.  To reiterate, the "root
requirement" of the Due Process Clause is that notice and
opportunity for hearing be provided *before* an individual is
deprived of a significant property interest unless a state must
act quickly or it would be impractical to provide pre-deprivation
process.  See, Gilbert v. Homar, Loudermill, and Boddie, all
supra.  Because notice and hearing must be provided at a

---

[11]  Although not specifically argued by the parties here, we suppose
that in theory, it would be possible for landlord property owners to initiate
the *scire facias* procedure immediately after they received their pre-lien
notices from PGW.  Putting aside for the moment that there has been no
notification before the pre-lien letters of the arrearages themselves, there
is also no record before us on how much time it would take for a *scire facias*
to wend its way through the Philadelphia Court of Common Pleas or whether the
filing for a rule to issue the writ would operate to stay the filing of liens.
Moreover, in view of PGW's acknowledged habit of advising landlords who wish
to appeal the imposition of its liens to the Public Utility Commission, it
appears that the City has no desire for its property owners to avail
themselves of the *scire facias* process.

meaningful time and in a meaningful manner, in situations where the State feasibly can provide a pre-deprivation hearing before taking property, it must do so regardless of the adequacy of a post-deprivation remedy to compensate for the taking.  Zinermon v. Burch, and Hamdi, both supra.  Again, "when pre-deprivation process could be effective in preventing errors, that process is required."  Montanez, 773 F.3d at 484.

The Defendant City takes the position that, quite simply, because the MCTLL affords some process for challenging the automatically recorded gas liens, it has satisfied its constitutional obligations.  It offers no explanation as to why it would be impracticable to or why it is unable to notify property owner landlords of its customers' delinquencies within such time as would allow the landlords to investigate and take steps to hold their tenants accountable *before* their account arrearages reached the level at which the Lien Management System determines liening to be appropriate.  PGW similarly proffers no reasons why it suddenly must act quickly to file liens once LMS determines that an account is sufficiently overdue and/or after the lien "blockers" or "exceptions" are removed.  Interestingly, PGW's practice of allowing large arrearages to accumulate is directly contrary to the Statement of Purpose and Policy governing public utilities set forth in the Pennsylvania Administrative Code, 52 Pa. Code §56.1, which provides:

24

(a) This chapter establishes and enforces uniform, fair and equitable residential public utility service standards governing eligibility criteria, credit and deposit practices, and account billing, termination and customer complaint procedures.  This chapter assures adequate provision of residential public utility service, to restrict unreasonable termination of or refusal to provide that service and to provide functional alternatives to termination or refusal to provide that service while eliminating opportunities for customers capable of paying to avoid the timely payment of public utility bills and protecting against rate increases for timely paying customers resulting from other customers' delinquencies. **Public utilities shall utilize the procedures in this chapter to effectively manage customer accounts to prevent the accumulation of large, unmanageable arrearages.** Every privilege conferred or duty required under this chapter imposes an obligation of good faith, honesty and fair dealing in its performance and enforcement.  This chapter will be liberally construed to fulfill its purpose and policy and to insure justice for all concerned.

(b) This subchapter and Subchapters B - K apply to electric distribution utilities, natural gas distribution utilities and water distribution utilities.  Subchapters L - V apply to wastewater utilities, steam heat utilities, small natural gas utilities and to all customers who have been granted protection from abuse orders from courts of competent jurisdiction.
                         (Emphasis added).

Further, as Plaintiffs point out, Philadelphia has passed an ordinance which specifically requires the city-owned water and sewer utilities to send duplicate water and/or sewer bills to property owners in cases where their tenants become delinquent in their bills for water and sewer service.  (Defendant's Exhibit R). Indeed, §19-1607 of the Philadelphia Code specifically speaks to situations where services are provided at "Premises Not Occupied by Owners" as follows:

(1) Any person, who, owning property situated in the City

25

and connected to the City's water or sewer systems, does not physically reside on such property, or any part thereof, and fails to pay a water or sewer bill

> (a) within 15 days after the enactment of this section where the bill has been delinquent six months or longer, or

> (b) within 90 days with respect to bills becoming due, after the enactment of this section, shall be subject to a fine not exceeding $100.

(2) The above penalty shall be imposed in addition to other penalties and interest for late payment as may now be provided by law.  The delinquency on any bill rendered for a separate period of water and sewer service shall constitute a separate offense.

(3) **If the Department directly bills a tenant of a property for services, and the tenant becomes delinquent in payment, the Department shall thereafter send duplicate bills to the owner of the property, or otherwise notify the owner of the delinquent status of the account, until the account is no longer delinquent.**
(Emphasis supplied)

As this ordinance suggests, the City itself has already recognized the benefit to affording notification to landlord property owners of their tenants' utility bill delinquencies within such time as to allow them to address those delinquencies and avoid such adverse consequences as fines, penalties, interest and liens and recognized that the fiscal and administrative burdens posed by an alternative procedure such as is outlined in Section 19-1607 are not especially heavy.

## Conclusion

In the final analysis then, we find that while the defendant city has an undeniably legitimate interest in obtaining redress

26

for unpaid gas bills, the property interests of Plaintiffs and other landlord property owners are clearly being unconstitutionally compromised by the defendant city's current procedures for placing liens to re-coup for those losses. To be sure, PGW's methods do not meet the fundamental requirements of due process in that they do not afford the plaintiffs and others like them the opportunity to address their tenants' arrearages at a meaningful time or in a meaningful manner nor is there any reason why the City cannot adopt an ordinance or follow a procedure similar to the one which it has adopted and which it follows with respect to the collection of overdue balances for water and sewer services. For these reasons, we find that partial summary judgment is appropriately entered in favor of the plaintiffs at this time.

An order follows.