**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
LEA AUGUSTIN, GERARD AUGUSTIN,      :
THOMAS MCSORLEY, DONNA MCSORLEY     :
RICHMOND WATERFRONT INDUSTRIAL      : CIVIL ACTION
PARK, LLC                           :
                                    :
              Plaintiffs            : NO. 14-CV-4238
                                    :
         vs.                        :
                                    :
CITY OF PHILADELPHIA                :
                                    :
              Defendant             :
```

<u>**DECISION**</u>

**JOYNER, J.**                              **January 4, 2017**

      We write now relative to the final motion of the plaintiffs[1] in this ongoing civil rights matter – that seeking the entry of permanent injunctive relief against the City of Philadelphia and its wholly-owned gas utility, Philadelphia Gas Works. Specifically, Plaintiffs now move to forever enjoin Defendant from filing any liens on real property where those liens are for unpaid gas services provided to PGW customers who do not own the property being liened using PGW's current methods for doing so. Following hearings on the instant motion and Plaintiffs' Motion

---

[1] Previously, in our Memoranda and Orders of March 17, 2016, May 4 and November 30, 2016, we granted the Plaintiffs' Motions for Partial Summary Judgment, for Preliminary Interim Injunctive Relief and to Certify this Matter as a Class Action. Although we reiterate many of the portions of those memoranda and orders in this decision as findings of fact and/or conclusions of law, in the interests of providing a thorough and complete record in this matter, we now hereby formally incorporate by reference into this Decision all of our preceding opinions and orders.

for Class Certification on July 26 and 27, 2016, we now make the following:

## FINDINGS OF FACT

1.  Plaintiffs Lea and Gerard Augustin are adult individuals residing at 221 Cadwalader Avenue, Elkins Park, Montgomery County, Pennsylvania.  (Trial Exhibit D-22, 3/3/15 Deposition of Lea Augustin, pp. 8-9).

2.  Mr. and Mrs. Augustin are also the owners of several parcels of residential real estate in the City and County of Philadelphia, located at 5105 Wayne Avenue, 2013 Stenton Avenue, 6174 North 17th Street, and 2147 Medary Avenue, all of which they are presently renting and/or in the past have leased out to tenants.  Several of those properties are multi-unit buildings, containing more than one apartment and more than one gas service meter.  (Trial Exhibit D-22, pp. 8-10, 12-15, 78-79).

3.  Plaintiffs Thomas and Donna McSorley are adult individuals residing at 204 Blair Road, Warminster, Bucks County, Pennsylvania.  (Trial Exhibit D-20, 2/19/15 Deposition of Thomas McSorley, p. 7; Trial Exhibit D-20).

4.  Mr. and Mrs. McSorley are also the owners of two parcels of real property situate in the City and County of Philadelphia at 1916 Griffith Street and 1903 Grant Avenue, both of which are residential rental properties containing more than one unit and more than one gas service meter.  (D-20, pp. 7-9, 22-23, 31).

5.   Plaintiff Richmond Waterfront Industrial Park, LLC is a Pennsylvania Limited Liability Corporation with offices at 10901 Dutton Road, Philadelphia, Pennsylvania.  (Trial Exhibit D-10; Pl's Class Action Complaint and Defendant's Answer thereto, ¶ 8; Trial Exhibit D-21, 6/26/15 Deposition of David Wolf, p. 12).

6.   Richmond Waterfront Industrial Park, LLC (hereafter "Richmond") is the owner of some 10 parcels of commercial/industrial real estate in the City and County of Philadelphia.  Among these is a 256,000 square foot facility located at 2950 Kirkbride Street, a/k/a 4701 Bath Street in Philadelphia, which is also subdivided into separate rental units with separate meters for the gas service provided to each unit. (D-21, pp. 8, 11-13, 16-20).

7.   Defendant City of Philadelphia is a municipal subdivision of the Commonwealth of Pennsylvania, the owner of Philadelphia Gas Works, and as such acts under color of state law.  PGW is the entity through which the City of Philadelphia provides gas services to residences and businesses within the City limits.  (Pl's Complaint and Defendant's Answer thereto, ¶s 9-10;D-20, pp. 23-24).

8.   Since July 1, 2000, PGW has had the legal status of a public utility subject to the jurisdiction of the Pennsylvania Public Utility Commission.  (N.T. 7/26/16, 75; 66 Pa. C.S.A. §2212(b)).

9.   Following the passage of Act 201 amending the Public

Utility Code, 66 Pa. C.S.A. §1401, *et. seq.* which took effect in December 2004, PGW, as a "city natural gas distribution operation furnishing gas service to a property" became "entitled to impose or assess a municipal claim against the property and file as liens of record claims for unpaid natural gas distribution service and other related costs, including natural gas supply in the court of common pleas of the county in which the property is situated or, if the claim for the unpaid natural gas distribution service does not exceed the maximum amount over which the Municipal Court of Philadelphia has jurisdiction, in the Municipal Court of Philadelphia, pursuant to sections 3 and 9 of the ... Municipal Claim and Tax Lien Law...(66 Pa. C.S.A. §2201, *et. seq*)."  66 Pa. C.S.A. §1414(a).

10.  Initially, PGW voluntarily agreed to delay implementation of the landlord lien provision of Act 201 until approximately December 14, 2005, one year after the effective date of the Act while it conducted a series of meetings and discussions with a "Landlord Task Force," which was made up of representatives from the Greater Philadelphia Association of Realtors, the Homeowners Association of Philadelphia, the Pennsylvania Residential Owners Association and small business investors and city residents in an effort to reach some type of agreement regarding how to best use Act 201 in a way that would benefit PGW's customers and provide a "reasonable, though perhaps distasteful process for landlords."  (Declaration of John Grogan,

annexed to Plaintiffs' Motion for Summary Judgment ("MSJ"),
Exhibit 1; Grogan Decl., Exhibit 6).

11.  Eventually, the result of the meetings and discussions
between the Landlord Task Force and PGW was the adoption of the
Landlord Cooperation Program in or around July, 2005.  Under that
program, residential landlords who fulfilled certain criteria
(such as having valid and up-to-date landlord licenses issued by
the City's Department of Licenses and Inspections) could register
their properties through PGW's website.  Provided the landlords
were "fully cooperative," no liens would be imposed upon their
registered properties while they were in the program and they
could receive notification when a tenant directed PGW to shut off
an account, possibly "skipping out" on a lease.  (Grogan
Declaration to Pl's MSJ, Exhibits 1, 7, 8, 11; Pl's SJ Exhibit 5,
pp. 98-99).

12.  For the next several years, between 2005 and 2008, PGW
"at times" placed liens for its customers' unpaid gas bills on
the real properties at which the gas had been provided pursuant
to Act 201 and the Municipal Claim and Tax Lien Law ("MCTLL),
irrespective of the fact that the customers were not the owners
of the properties liened.  Defendant did so using a "slightly
automated" but primarily manual system.[2]  (Plaintiffs' Compendium

---

[2]   As we explained in footnote 2 in our Memorandum and Order of March
17, 2016, it was and is this Court's understanding that "manual" means only
that it is necessary for a person to input the information necessary and to
take the steps required to file or record the liens for unpaid gas service
with the appropriate Philadelphia court.  This differs from the "automated"
computerized Lien Management System which was later developed to automatically

of Deposition Excerpts and Declarations in Support of Plaintiffs'
Motion for Summary Judgment, Exhibit 2, pp. 43-44, 49-51).

13.   In 2009, PGW began utilizing the computerized system
for automatically liening real estate which it had developed,
called the "Lien Management System" or "LMS."  (Pl's Compendium,
Exhibit 2, p. 43).  The goal of this system, which is entirely
automated, is the processing of some 200-300 liens per day, more
quickly, less expensively and with fewer human errors than the
"manual" method.  (Pl's Compendium, Exhibit 1, pp. 37-42, Exhibit
2, p. 43).

14.   At present, LMS functions by automatically "trolling"
the account data in PGW's Customer Billing and Collections
Database ("BCCS") to identify accounts as "lien eligible"
depending upon the extent of the account arrearage and the length
of time it has gone unpaid. (Pl's SJ Exhibit 1, pp. 21, 51-52,
99).  To illustrate, in the case of a typical residential
account, once an arrearage reaches $300 and more than 91 days
have elapsed since the last payment was made, it is considered to
be eligible for liening and an automated pre-lien notification
letter sent to the owner of the property where the gas service
was provided.  (Pl's SJ Exhibit 2, pp. 18-22).

15.   There are, however, circumstances under which this
process can disrupted manually, *i.e.*, someone in the business or

---

undertake each of the necessary steps to accomplish the filing and recording
of the gas liens and to interface with other internal PGW systems and external
systems, such as the Philadelphia County Courts and Offices.

crediting collections departments must intervene and make an adjustment into the system to prevent, for example, a pre-lien letter from being sent or to vacate a lien.  (Pl's SJ Exhibit 1, 76-77, 229).  These adjustments, which PGW refers to as "exceptions" or "blockers" differ depending upon whether the property at issue is residential or commercial in nature.  (Pl's SJ Exhibit 2, pp. 37-39).

16.  Thus, once an account is determined by the Lien Management System to be lien-eligible, the system will further automatically check to see whether there any blocking conditions which are attached to the account.  If there are no "blockers," and if the system can identify a property owner's name and an address, LMS sends the lien information to the Court, after first activating the mailing of the Pre-Lien Notice.  However, if a "blocker" does exist on the account, the liening process, including the mailing of the Pre-Lien Notice, is suspended until such time as the blocking conditions have been resolved either in the BCCS or by the manual intervention of PGW collection personnel.  (Pl's SJ Exhibit 1, 117-120).

17.  Although they are similar, exceptions and blockers do differ - there are some blockers which are not exceptions and some exceptions which are not blockers.  (Pl's SJ Exhibit 2, pp. 31-32).  Generally speaking, blockers are put on in the BCCS system and will block an account from being liened automatically, although they can be overridden manually.  (Pl's SJ Exhibit 1, p.

229; Pl's SJ Exhibit 2, p. 29).  Exceptions, on the other hand,
are put on in the LMS and likewise operate to prevent an account
from being liened (Pl's SJ Exhibits 1 and 2, at pp. 229 and 29,
respectively).  Examples of exceptions include being a registered
landlord in the Landlord Cooperation Program ("LCP"), a customer
being designated as a member of the Customer Responsibility
Program ("CRP"), *i.e.*, they are low income, or as having some
type of medical condition such that PGW cannot turn off service.
(Pl's SJ Exhibit 1, pp. 47-48, 51-52).  Blockers can also arise
where a customer has entered into a negotiated payment
arrangement for an overdue account or where there is a "name
mismatch" such that the property owner's name and the property's
user's name are not the same.  (Pl's SJ Exhibit 1, pp. 117-120).

    18.  At present, there are at least 7 different "lien
models" provided for in the LMS system, which govern when a lien
is selected to be or may be filed against a property.  (Pl's SJ
Exhibit 2, pp. 16-17).  These models are subdivided into those
governing when to lien a commercial property and when to lien a
residential property and are further categorized by such
variables as the length of time the account has been in arrears,
the amount of the arrearage, whether the account or service
agreement has been closed and/or written off, whether the gas
service to the property has been shut off and whether the
property has been recently sold.  (Pl's SJ Exhibit 2, pp. 17-22).
Although the models have been changed from time-to-time, neither

the models themselves nor the changes thereto have ever been made public. (Pl's SJ Exhibit 2, pp. 41-42).

19. As a result of the many exceptions and/or blocking conditions placed into the system, it is not uncommon for there to be significant delays in the processing of a lien that extend well beyond the date that LMS first flags an account as lien eligible, resulting in the filing of many liens well in excess of the $300 threshold. (Pl's SJ Exhibit 2, pp. 54-58).

20. Again, if there are no blockers or exceptions on an account, then the system will commence the liening process which starts with the sending of an automated pre-lien notice letter. (Exhibit X to Defendant's Motion for Summary Judgment, p. 89). Once a pre-lien letter is sent, unless the amount indicated in the letter is paid within the time period provided, the LMS automatically sends the lien information to the office of the Prothonotary and the lien is recorded against the property. (Pl's SJ Exhibit 1, pp. 82, 117-120). It is apparently not uncommon for a pre-lien and a subsequent post-lien notification letter to be sent to the service address (*i.e.,* the address at which service is provided and the property which is liened) rather than the landlord/property owner's registered mailing address, despite the fact that this address is what must be listed on the landlord's rental license. As a result, some landlords do not receive these notifications until long after a lien has been placed upon their property(ies). (Pl's SJ Exhibit

1, pp. 122-124; Pl's SJ Exhibit 8).

21.  Prior to November 2012, LMS was programmed to provide a period of 11 days from the time a pre-lien letter was sent to the time that properties were liened; since that time, 30 days' notice is now afforded.  (Pl's SJ Exhibit 1, pp. 82-84; Pl's SJ Exhibit 2, pp. 38-40).

22.  Presently, LMS operates by automatically creating a file which is uploaded to PGW's contracted mailing company, KUBRA, and it is KUBRA which then actually mails the pre- and post-lien notices to the property owners via U.S. Mail notifying them that PGW has liened their property.  (Pl's SJ Exhibit 1, pp. 91-95; Grogan Decl., Exhibit 3).

23.  However, if there are blockers on the account, the liening process is suspended until such time as the blockers are removed, after which any debt on the account can be liened. (Pl's SJ Exhibit 2, pp. 97-99, 142-144).  A customer can continue to receive service and accrue debt on his or her account while a blocker is in place – a blocker will only operate to forestall the sending of notice and the placement of a lien on the property where the service was provided.  (Pl's SJ Exhibit 1, pp. 125-134, 218-219, 221; Pl's SJ Exhibit 2, p. 63).

24.  Among the blockers which can prevent a property from automatically being liened is the "name mismatch" and "address mismatch" blockers, which arise where the name on the delinquent account and the service address listed in the BCCS does not match

with the name and/or address identified as belonging to the property owners in the City of Philadelphia's Office of Property Assessments ("OPA")[3] database.  Although these properties can be liened manually, it is not uncommon for this blocker to delay the pre-lien notices from being sent for years, all while the account arrearages continue to grow.  (Pl's SJ Exhibit 1, pp. 79-80, 119-157; Pl's SJ Exhibit 2, pp. 54-56).

25.  Exceptions function in a similar manner.  Where an account is on the exceptions list, the issuance of a lien is delayed until such time as the exception is no longer applied, although debt can continue to accumulate.  (Pl's SJ Exhibit 2, pp. 56-57, 63).

26.  Debt often accumulates over many years as a result of PGW continuing to provide gas service on a delinquent account.  (Pl's SJ Exhibit 2, pp. 63, 70-74; Pl's SJ Exhibit 4, pp. 63-65, 71, 98-99).  In such situations and where the customer is not the property owner but is instead a tenant of a landlord, the landlord is not told that the customer is not paying his gas bills unless they are specifically authorized to receive this information or are a third-party designee on the account.  (Pl's SJ Exhibit 2, pp. 63-64; Pl's SJ Exhibit 4, p. 169).  As a result, landlords are often unable to take any action to prevent large liens from being assessed against their properties and are

---

[3]  The Office of Property Assessment was previously called the Board of Revision of Taxes (or "BRT").  (Pl's SJ Exhibit 1, pp. 30, 77-78).

unable to recoup those funds from tenants who have long since vacated their properties, frequently without paying their rents either.  (Pl's SJ Exhibits 8, 9, 10; Defendant's SJ Exhibit A, pp. 39-43, 78-79, 89; Def's SJ Exhibit H, pp. 55-58; Def's SJ Exhibit M, pp. 118-119).

27.  Although PGW ostensibly has a "rule" that it will not lien debt which is older than four years, this rule is not always followed.  To the contrary, PGW has liened properties for debts as old as ten years and has taken the apparently contradictory position that so long as a property has not changed hands, it can lien it at any time.  (Pl's SJ Exhibit 2, pp. 66-74, 161-162; Pl's SJ Exhibit 4, pp. 69-72, 90-99, 101-104, 130-134; Pl's SJ Exhibit 10, ¶s 5, 8).

28.  This is precisely what happened to the named Plaintiffs in this case.  Lea and Gerard Augustin own two properties which were liened repeatedly for unpaid tenant bills during the period 2009-2012.  Those liens total over $19,500 on one property and approximately $17,000 on the other and relate, at least in part, to tenancies dating back to 2004.  (Pl's SJ Exhibit 8; Def's SJ Exhibit M, p. 54; Def's Trial Exhibit 22, pp. 23-25, 58-61; Pl's Trial Exhibit P-1).  In the case of Thomas and Donna McSorley, two liens were assessed against a rental property which they own on Griffith Street in the amounts of $1,066.79 and $1,144.31. (Pl's SJ Exhibit 9).  Richmond Waterfront Industrial Park received notices on October 31, 2012 that PGW was placing liens

in the amount of $3,553.72 and $27,447.86 on its commercial real estate at 4701 Bath Street.  The latter, larger lien was attributed to a PGW indebtedness dating back to June 2003.  (Pl's SJ Exhibit 10).

29.  Even after a landlord receives notice that a lien has been or is going to be placed against his property, PGW will disclose little, if any information about the underlying debt, on the grounds that it is prohibited by the Public Utility Code from revealing confidential customer information.  (Pl's SJ Exhibit 2, p. 64; Pl's SJ Exhibit 3, p. 57; Pl's SJ Exhibit 10; N.T. 7/26/16, pp. 132-134, 192; Def's Trial Exhibit 19).  Generally speaking, PGW will not disclose to the property owner/landlord the identity of the tenants who incurred the debt or over what period of time the debt was amassed.  (Pl's SJ Exhibit 1, pp. 58-62; Pl's SJ Exhibits 8, 9, 10; Def's SJ Exhibits H and M, at pp. 57-58 and 54, 57-61, respectively).  When a property owner asks what remedies he or she might have to contest the placement of the lien, PGW informs them that they can file a complaint with the Pennsylvania Public Utility Commission ("PUC"), an entity which has repeatedly taken the position that it has no jurisdiction to act in matters which arise under the Municipal Claim and Tax Lien Law or in which the issue is the amount or validity of a lien.  (Pl's SJ Exhibit 4, p. 129; Pl's SJ Exhibits 8, 10; Def's SJ Exhibit M, p. 58; Def's SJ Exhibit P; N.T. 7/26/16, pp. 138, 140, 145-149).

30.   PGW also does not give notice to a landlord when a customer with an arrearage moves to a new address and obtains gas service at the new location or when a customer with an outstanding balance on an account relocates to a new address and is required to make a security deposit with PGW to ensure payment.  (Pl's SJ Exhibit 2, pp. 13-14).  Nor does PGW require the customer to pay an outstanding balance on his or her account before permitting the customer to obtain gas service at the new address.  Instead, it merely opens a new service agreement and allows the arrearage to remain on the old service agreement for the previous address.  (Pl's SJ Exhibit 2, pp. 133-134).  If and/or when the customer makes a payment, PGW distributes the payment throughout the customer's account, with the result that although some portion of the payment may be credited against the arrearage, how those payments are credited is unclear.  (Pl's SJ Exhibit 2, pp. 134-135).

31.  It is quite easy for a tenant to obtain gas service from PGW regardless of whether they have a balance from a previous address.  (Pl's SJ Exhibit 6, p. 21).  Indeed, the tenant need only place a telephone call to PGW and give it the new landlord's name and telephone number, the lease start date and the location of the property where the gas is to be provided. Occasionally PGW "may require documentation to try to determine could they possibly be responsible for that balance at the property they're moving to as well" if the gas is on at the new

property and there's a large balance at that address.  (Pl's SJ
Exhibit 6, 21-24).  PGW does not normally try to capture the
landlord's mailing address at the time the tenant applies for
service.  (Pl's SJ Exhibit 6, p. 24).

32.  One of the only avenues by which a landlord can obtain
some relief from the liening process and any information from PGW
is by enrollment in the Landlord Cooperation Program ("LCP"),
which went into full operation in April, 2010.  (N.T. 7/26/16, p.
188; Pl's SJ Exhibit 2, 64).  Under that program, landlords who
register their rental properties receive lien protection from the
moment that a property is registered and they can receive
notification from PGW when a tenant has requested shut off of an
account so long as they fully cooperate and respond to emailed
notices and communications from PGW.  Thus, lien protection is
prospective only and has no effect on the arrearages that were
attributed to that property prior to enrollment in the LCP.
(Pl's SJ Exhibit 5, 97-99; Pl's SJ Exhibit 1, p. 71; Def's SJ
Exhibit R; N.T. 7/26/16, 188-189).

33.  To enroll in LCP, a property owner must have an active
rental license with the Philadelphia Department of Licenses &
Inspections, must enroll online through PGW's website and have an
email address because, with the exception of letter notification
of a lapse in the landlord license, email is the only manner that
PGW communicates with LCP members.  Thus, if a property owner
does not have access to a computer, they are foreclosed from

enrolling in LCP, although they can designate an agent to receive email for them.  (N.T. 7/26/16, pp. 190-192; Pl's SJ Exhibit 5, pp. 90-92; Def's SJ Exhibit M, pp. 48-49).

34.  To remain in the Landlord Cooperation Program, PGW requires what it determines in its discretion to be "complete cooperation."  (Pl's SJ Exhibit 1, p. 71; Pl's SJ Exhibit 5, pp. 97-98; N.T. 7/26/16, pp. 192-197).  If a landlord fails to renew his/her rental license with L & I, fails to respond to an email from PGW, fails to appear for an appointment, or fails to provide access to his or her property for any reason, that landlord is deemed uncooperative and expelled from the program, also often without notice.  (Pl's SJ Exhibit 1, 69-71; Def's SJ Exhibit M, pp. 48-49; Def's SJ Exhibit Q, p. 65; N.T. 7/26/16, pp. 196-204).  The determination that a landlord is uncooperative is generally made automatically by PGW's computer system.  (Pl's SJ Exhibit 1, p. 71; N.T. 7/26/16, p. 196).

35.  The operation of LCP is in no way flawless.  PGW is the frequent recipient of complaints from landlords that they were improperly marked uncooperative for such reasons as failing to appear for appointments when they in fact were present.  Because they are marked "uncooperative" when the PGW technician enters such information, they lose the LCP protection from arrears as of the date of that entry and can be liened immediately thereafter.  (N.T. 7/26/16, pp. 202-205; Pl's SJ Exhibit 5, pp. 98, 130-133; Def's SJ Exhibit Q, pp. 67-68.).  Although they can be reinstated

into the program at PGW's discretion, they are not protected from the entry of any liens that may have been placed in the interim. (N.T. 7/26/16, pp. 197-198, 205-206).  Finally, it is not uncommon for there to be errors in the amounts of the liens placed, necessitating the manual removal of the original lien and replacing it with a lien in the correct amount.  (Pl's SJ Exhibit 5, pp. 132-133).

36.  In the last few years, PGW has also offered a Commercial Lien Notification Program for commercial landlords. Although this program has many of the same requirements as LCP, including that enrollment be online, that landlords have current commercial licenses issued by L & I, and that they "fully cooperate," it does not protect a property owner from having liens placed against his property when the property is registered.  Instead, its only benefit is that the commercial landlord is afforded with an additional 30 days' notice before a lien is imposed. (Pl's SJ Exhibit 5, pp. 134-136; Def's SJ Exhibit Q, pp. 137-140).

37.  Although there are presently over 43,000 licensed landlords who are enrolled in the LCP, many of the city's landlords have no knowledge of either the LCP or Commercial Lien Notification Program ("CLNP") and it appears that there is little effort to publicize or advertise the programs by PGW, aside from a tab on PGW's website with a link to information on the programs.  On various past occasions, some advertisements

regarding LCP were run in newspapers, on the radio and in a few national magazines and community newspapers such as the Northeast Times, Metro and Girard News, but it does not appear that these advertisements are still running.  The City does put an insert containing some information on the programs in with the license renewal bills once a year and does some community outreach from time-to-time with the Greater Philadelphia Association of Realtors, the Homeowners' Association Company, Coldwell Banker's rental agent affiliates and on at least one occasion went to the Southwark Community Center in University City.  (Def's SJ Exhibit Q, pp. 54-56; Def's SJ Exhibits R - V; N.T. 7/26/16, 198-201; Trial Exhibit D-28, ¶83).

38.   Plaintiffs Thomas McSorley and Lea Augustin learned of the LCP only after they called PGW's offices questioning some of the pre-lien notices they had received for their properties. (Def's SJ Exhibit H, pp. 46-49; Def's SJ Exhibit M, pp. 47-49). Although the Augustins enrolled in LCP, they were also on at least one occasion unbeknownst to them determined to be uncooperative for failure to respond to an email that had been sent to their son's email address.  They did re-enroll through their daughter and are presently in the program.  (Def's Trial Exhibit D-22, pp. 46-53; Exhibit D-28, Stipulation of Facts, ¶s 67-69).  The McSorleys have never enrolled in LCP.  (Def's Trial Exhibit D-20, pp. 40-41, 46-50; Exhibit D-28, ¶s 44-45).

39.   The Pennsylvania Municipal Claim and Tax Lien Law does

provide a means by which a property owner may contest the placement and amount of a municipal claim through the filing of a notice upon the claimant to issue a writ of *scire facias* and force a hearing on the municipal claim.  See, 53 P.S. §§7183, 7184, *et. seq*.  This remedy is available only after a lien has been placed and none of the named plaintiffs in this case have availed themselves of the *scire facias* procedures.  (Trial Exhibit D-28, Stipulation of Facts, ¶6).

40.  With the exception of the *scire facias* procedure and participation in the LCP and/or CLNP, there are no other processes by which an owner of real estate that has been liened by PGW may contest the placement of such a lien.  (N.T. 7/26/16, 62-65).  It is, however, feasible and would be fairly easy and inexpensive for the City to create a method for resolving disputes between landlords and PGW arising out of the placement of gas liens.  Indeed, one solution would be for the City to follow the same principles that it uses in its dispute process for the Water Department.  For the first step in the grievance process, the City could employ the same internal and informal procedures that it now uses with its existing staff.  If the dispute could not be resolved using the informal process, the disputes could be pursued further through a formal process with, for example, the Philadelphia Gas Commission as arbiter.  (N.T. 7/26/16, pp. 65-69, 150).

41.  PGW does have the responsibility of safeguarding its

customers' personal information and taking measures to prevent
the unauthorized use of such information.  PGW could very well be
subjected to civil penalties or other regulatory sanctions by the
PUC if it were found to have provided customer-specific account
information without the express consent of that customer.  (N.T.
7/26/16, pp. 70, 75-77, 95-96, 132-133).

42.  In order for PGW to be able to release customer account
information, it would have to have express authorization from its
customer, even if the person seeking the information was the
customer's landlord and the owner of the property subject to
being liened for the customer's failure to pay his or her gas
bill.  (N.T. 7/26/16, pp. 70-71, 94).  As a pre-condition to
obtaining gas service, PGW could present its customers with an
express authorization form giving PGW permission to notify a
landlord that a customer has fallen behind in the payment of
his/her gas bills and informing the landlord that their interests
might be implicated.  (N.T. 7/26/16, pp. 71, 94-95, 151-155).

43.  PGW's tariff with the PUC requires customers to
identify themselves as a tenant and to provide PGW with the name
and address of the landlord.  (N.T. 7/26/16, p. 71).  The tariff
would also allow for the inclusion of an additional provision
stating that should a customer's account become sufficiently
delinquent, it will cause the property at which the gas is being
delivered to become lien eligible and in that event the customer
thereby implicitly gives PGW authority to notify the landlord of

the customer's outstanding debt and that the landlord's property
is subject to liening as a result.  (N.T. 7/26/16, pp. 71-72,
94).

44.  Presently, despite the customer confidentiality
requirements imposed upon PGW by the PUC and under Pennsylvania
public utility law, PGW does disclose the name(s) of delinquent
customers, the amount(s) of their delinquencies and the period of
time over which they amassed those arrearages at the time of
settlement when a property which has been liened is being sold
and the liens paid off.  (N.T. 7/26/16, pp. 160-162).

45.  In addition to PGW requiring a tenant and prospective
gas customer to provide implicit or express consent to the
disclosure to a property owner of what would otherwise be
confidential information regarding his or her gas account in the
event of a delinquency, landlords could just as easily include
such a condition in their lease agreements with their tenants.
(Trial Exhibit D-28, ¶79).  That is, it would be a smart practice
on the part of a landlord to require a prospective tenant to
execute a written authorization at the time a lease is signed
permitting PGW to reveal such confidential account information as
the name of the tenant, the amount of any outstanding account
balances and the length of time such a balance has gone unpaid to
the landlord.  (N.T. 7/26/16, pp. 98-101).

46.  Plaintiff Richmond, after learning that PGW could place
liens against its property, sent notices to all of its tenants

directing them to forward copies of their gas bills to it each
month so that it could be assured that the bills were being paid.
With the exception of just one of its tenants, these notices were
largely disregarded.  (Def's Trial Exhibit 21, pp. 22-23, 45-49,
51; Trial Exhibit D-28, ¶21).  Now, with regard to some of its
tenants, Richmond has put the gas service into its own name and
it then forwards the bills to those tenants for payment.  (D-21,
20-21, 50-52).

47.  The current methodology used by PGW to lien real estate
for unpaid gas bills belonging to non-owner residents does not
afford the owners of that real estate sufficient notice and/or an
opportunity to be heard on the propriety and/or amount of a lien
within such time and in such manner as to enable them to defend
against the taking of their property.   (Memorandum and Order of
March 17, 2016, (Doc. No. 50), at pp. 20, 26-27).

48.  Notwithstanding the placement of the liens on their
properties, none of the plaintiffs have suffered any injury to
their personal credit or been impeded or hampered in securing
personal loans or re-financing their personal residences.  (Def's
Trial Exhibits D-20, D-21 and D-22, at pp. 14-20, 80-82, 33-37,
respectively; Trial Exhibit D-28, ¶s 35-38, 61-62, 74-76).  The
gas liens have not impeded the plaintiffs' ability to maintain
their properties or collect rents.  (Trial Exhibit D-28, ¶s 35,
38, 61, 74).

49.  The City has not sought enforcement and does not

actively pursue execution of the liens against Plaintiffs but
they will remain on their properties until paid off.  That is,
the process by which PGW collects on liens is that it waits for
properties to either be sold or refinanced such that the owner
needs to clear title to their real estate.  (N/T. 5/3/16, pp. 26-
27; Def's Trial Exhibit D-22, pp. 62, 75-77; Trial Exhibit D-28,
¶34).  To date, none of the plaintiffs have attempted to sell,
mortgage or refinance their rental properties.  (Trial Exhibit D-
28, ¶77).

50.   A "mismatch lien" is defined as a lien filed against a
property where the property owner was not the PGW customer of
record, *i.e.*, the holder of the account for which the lien is
being placed.  In PGW's parlance, a "mismatch lien" could arise
out of a landlord-tenant arrangement but it might not.  (N.T.
5/3/16, pp. 17-18).  At present, less than 50% of the mismatch
liens on record at PGW are attributable to a landlord-tenant
situation.  (N.T. 5/3/16, pp. 18-19).  For the time period 2009
through March, 2016, there were a total of 80,031 mismatch liens
(both residential and commercial) filed against properties in the
Court of Common Pleas of Philadelphia County in an aggregate
amount of $71,813,122.  (N.T. 5/3/16, pp. 19-24; N.T. 7/26/16,
pp. 171-172; Trial Exhibit D-24).

51.   Although PGW's collection rate is only at 65%, liening
has produced some significant revenue for the City.  Between 2009
and March, 2016, the City collected $46,437,920 in revenue as the

result of gas liens, with $25,375,202 still outstanding.  (N.T. 5/3/16, p. 22; N.T. 7/26/16, pp. 171-172; Trial Exhibit D-24).

52.  Among the sources for that $46,437,920 in revenue were not only payments made by property-owner landlords at closing of sales of liened properties but also any payments that may have been made by the customers/account holders themselves on their long-standing arrearages.  (N.T. 5/3/16, pp. 28-29; N.T. 7/26/16, 173-175, 178-179).  Additionally, between 2010 and May 2, 2016, there were 9,127 Sheriff's sales of property where the property owner was different than the PGW account holder, *i.e.,* "mismatch liens," which liens totaled $12,902,375.  The City collected $6,699,862 associated with the original debt as a result of filing a lien and securing its lien priority rights.  (Trial Exhibit D-28, ¶87).

53.  PGW's revenue only comes from one source and that is its customers.  Therefore, to the extent that one group of customers is not paying, the utility will look to its other customers to make up the deficiency.  (N.T. 5/3/16, p. 36).

54.  The primary method by which PGW makes up a revenue shortfall is through a rate increase.  To obtain a rate increase, PGW must apply to the Pennsylvania Public Utility Commission, which will analyze the numbers behind the request that PGW makes and determine whether to approve the rate request.  (N.T. 5/3/16, pp. 34-35; N.T. 7/26/16, pp. 184-185).

55.  Rate requests look forward into the future by picking

a "test year."  One of the elements in the rate base is bad debt.
This fall, PGW was slated to go before the PUC with a rate
increase request based upon fiscal year 2018 into which it was
expecting to incorporate the expected revenue shortfall resulting
from this Court having found its landlord liening process
unconstitutional. (N.T. 5/6/13, pp. 37-39; N.T. 7/26/16, pp. 181-
182).

    56.  Sometimes years after a bad debt has been taken as an
expense and factored into the calculation of the rate base, money
will be received through the lien collection process.  (N.T.
5/3/16, pp. 39-40).

    57.  When a new Sheriff's sale is completed and there is no
municipal gas lien of record, the City has permanently lost its
right to secure its debt.  The same thing is true with respect to
all property transfers that have unpaid municipal gas debt which
has not been reduced to a lien when the debt is more than three-
plus the current calendar year old.  (Trial Exhibit D-28, ¶s 88,
89).

    58.  Of course, all of PGW's gas customers - residential,
commercial, homeowners and tenants, are negatively impacted by a
rate increase because they are required to pay more for gas and
gas service.  (N.T. 7/26/16, p. 182).

    59.  There is a "vacate lien" function in the automated LMS
whereby the crediting collections department can easily vacate
liens that have been previously placed.  (Hearing Document and

Pl's SJ Exhibit 1, pp. 76-77).

## Discussion

As we noted above in footnote 1, this Decision is the last installment in this litigation, given our previous findings that the procedures which PGW is presently following to place liens for unpaid gas service belonging to non-customer property owners is violative of the procedural due process clause of the 14th Amendment, that the City of Philadelphia/PGW is properly preliminarily enjoined from continuing this practice, and that the named plaintiffs herein and their counsel are appropriate representatives for the class of Philadelphia landlords whose properties have been or will be liened for the unpaid gas services of their delinquent tenants going forward.  We write now on the question of whether the earlier-entered preliminary injunction should be made permanent.

Though similar, the standard for granting a permanent injunction differs from the standard for entering a preliminary injunction.  ACLU of NJ v. Black Horse Pike Regional Board of Education, 84 F.3d 1471, 1477 (3d Cir. 1996).  It has long been recognized that preliminary injunctive relief is an extraordinary remedy never awarded as of right and which is properly granted only in limited circumstances.  Groupe SEB United States, Inc. V. Euro-Pro Operating LLC, 774 F.3d 192, 197 (3d Cir. 2014); Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004)(quoting American Tel. & Tel. Co. v. Winback & Conserve

<u>Program, Inc.</u>, 42 F.3d 1421, 1427 (3d Cir. 1994)).  "A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  <u>Id</u>.  The failure to establish any element of that test renders a preliminary injunction inappropriate.  <u>Arrowpoint Capital Corp. v. Arrowpoint Asset Management, LLC</u>, 703 F.3d 313, 318-319 (3d Cir. 2015).  A permanent injunction, in turn, requires actual success on the merits.  <u>State Troopers Fraternal Ass'n. of New Jersey v. New Jersey</u>, No. 13-4822, 2014 U.S. App. LEXIS 17687, 585 Fed. Appx. 828, 830 (3d Cir. Sept. 15, 2014); <u>Shields v. Zuccarini</u>, 254 F.3d 476, 482 (3d Cir. 2001).  In other words, when deciding whether to grant a permanent injunction, the district court must therefore consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably harmed by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the non-moving party; and (4) the injunction would be in the public interest.  <u>SM& & J, Inc. v. NRG Heat & Power, LLC</u>, 912 F. Supp. 2d 189, 200 (M.D. Pa. 2012). Accordingly, in deciding whether a permanent injunction should be issued, the court must first determine if the plaintiff has actually succeeded on the merits and, if so, it must then

consider the appropriate remedy." <u>State Troopers</u>, and <u>ACLU v. Black Horse Regional Board of Ed.</u>, both <u>supra</u>; <u>CIBA-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.</u>, 747 F.2d 844, 850 (3d Cir. 1984).

The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion. <u>Ebay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed.2d 641 (2006); <u>Hayes v. Ohio National Financial Services, Inc.</u>, 642 F. Supp. 2d 456, 462 (E.D. Pa. 2009). Indeed, "[d]istrict courts are afforded considerable discretion in framing injunctions." <u>Groupe SEB United States, Inc. v. Euro-Pro Operating LLC</u>, 774 F.3d 192, 206 (3d Cir. 2014)(quoting <u>Meyer v. CUNA Mutual Ins. Society</u>, 648 F.3d 154, 169 (3d Cir. 2011)). An abuse of discretion occurs when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. <u>NAACP v. North Hudson Regional Fire & Rescue</u>, 665 F.3d 464, 475 (3d Cir. 2011).

Finally, it should be noted that the purpose of an injunction is to prevent future violations and as a result, before an injunction may properly issue, the court must find that there exists some cognizable danger of recurrent violation. <u>United States v. EME Homer City Generation L.P.</u>, 823 F. Supp.2d 274, 290 (W.D. Pa. 2011)(citing <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)). Where

the illegal conduct has ceased, the party seeking the injunction bears the burden of proving that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.  Id.; Sease v. School District of Philadelphia, 811 F. Supp. 183, 193 (E.D. Pa. 1993)(citing U.S. v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S. Ct. 690, 96 L. Ed. 978 (1952)).

In applying these legal precepts to the case before us, we first observe that by virtue of our March 17, 2016 decision granting partial summary judgment in favor of Plaintiffs, it is indeed clear that Plaintiffs here have succeeded on the merits of their case.  That is, we have already found that the methods and procedures which the City follows in imposing gas liens for debts incurred by customers who do not own the properties upon which those liens are being placed fail to comply with the due process requirements of the Fourteenth Amendment.  The first pre-requisite to permanent injunctive relief has therefore been established here.

We next consider whether the moving party, *i.e.*, the plaintiffs, will be irreparably harmed by the denial of injunctive relief and after due consideration, we find that this element is also satisfied.  For one, if the City were allowed to continue to follow its current procedures for liening properties of the Plaintiff Class members, those class members will continue to suffer the deprivation of their property interests without due

process of law.  The City has not agreed to change its procedures
and methods, but has instead steadfastly insisted that it has a
right to do what it is doing, on the guise that because the liens
are placed against real estate pursuant to the MCTLL, the
proceedings are *in rem* only and because the Pennsylvania
Commonwealth Court in <u>City of Philadelphia v. Perfetti</u>, 119 A.3d
396 (Pa. Cmwlth. 2015) held that its procedures sufficiently
comported with due process.  (N.T. 5/3/16, pp. 6, 44-46).
Although since the March, 2016 summary judgment decision, the
City has apparently put a temporary halt to the liening process,
no changes have been made to the landlord notice procedures with
the result that the arrearages on PGW's delinquent customers'
accounts continue to grow and compromise the property interests
of the members of the plaintiff class.  (N.T. 5/3/16, pp. 6, 12-
13).  PGW has not suspended its liening of properties that are
subject to foreclosure and Sheriff's sales but it has agreed to
track the funds which it receives from those sales. (N.T. 5/3/16,
7-8, 12-13).  By the City's own admission, however, in the
absence of a court order, there is no guarantee that it won't
discard these temporary measures and resume its "liening as
usual" practices, nor is there anything to ensure that the City
won't decide to start affirmative collection measures against the
owners and the properties which it has already liened.  (N.T.
5/13/16, pp. 11, 14).

     Although it is of course plausible that the plaintiffs could

be made whole through an award of money damages, the threatened
constitutional harm is ongoing.  It is simply not practical to
require the plaintiffs to repeatedly institute suit against the
defendant to recover monies erroneously taken and, in the event
that the City should elect to begin foreclosing on liened
properties, it is certainly possible that these properties would
be forever lost in a sale.  Thus we find that the plaintiffs here
are threatened with harm that could indeed be irreparable.

Turning now to the balance of harms and the public interest,
and as we observed in our March 17, 2016 Memorandum, the City of
Philadelphia unquestionably has a legitimate interest in
obtaining redress for unpaid gas bills.  It is further clear that
all of PGW's customers benefit when these bills are paid inasmuch
as PGW does not have to raise its rates to compensate for the
shortfall caused by those who are delinquent. (N.T. 5/3/16, 35-
36).  That the City's  collections efforts are aided
significantly by its liening of real property for these
arrearages is also by now well-established.  Presently, according
to the testimony of Bernard Cummings, there is some $25,375,202
still outstanding in uncollected liens, and arrearages are
continuing to accrue.  (N.T. 5/3/16, p. 22; N.T. 7/26/16, pp.
171-172; Trial Exhibit D-24). Should those outstanding liens be
invalidated, PGW would factor in to its next rate increase
request the amount of money that it would expect to lose as a
result.  (N.T. 7/26/16, pp. 181-182).  Consequently, there is no

question but that the City and its gas customers would suffer harm should this Court decide to make the preliminary injunction entered on May 4, 2016 permanent.

The Plaintiffs of course, are also harmed by the process which is presently being employed by the City to lien their properties.  Again as we explained at length in the March, 2016 Memorandum, by liening their properties, the City is charging the members of the plaintiff class with the debts of individuals other than themselves - individuals who are both tenants of the plaintiff landowners and customers of the gas utility.  That the City has a right to do so under Pennsylvania state law is not disputed.  It is, however, the *means* by which the City is doing so which has been challenged and which this Court has found to be an unconstitutional taking by virtue of its failure to give notice to the plaintiffs of the takings at a meaningful time and in a meaningful manner.  Again, in view of the dearth of information given to the plaintiffs about whose bills they are being charged with, when those bills were incurred and for how long a period of time they have been outstanding, there is no realistic manner for the plaintiffs to challenge or appeal the amounts of debt to which the liens are attributable or, in most cases, to recoup the funds from what are frequently long-gone tenants.  From this, we find that the balance of harms on both parties to this litigation are nearly equal.

This equality notwithstanding, the City has remedies

available to it which the plaintiffs do not have.  For one, the
City is, by its own acknowledgment, free to continue to pursue
repayment from the customers themselves.  By this action,
Plaintiffs do not seek to invalidate the debts owed to PGW; what
is at issue here only are the liens which presently secure those
debts.  Indeed, as Mr. Cummings and Mr. Golden both testified, it
is not uncommon for its delinquent customers to make payments on
overdue bills for which their landlord's properties have been
liened.  (N.T. 5/3/16, pp. 29-31; N.T. 7/26/16, pp. 173-175).
Accordingly, the amount of money which the City alleges that it
stands to lose in the event this Court should declare the liens
invalid may not be wholly accurate.

     Additionally, it is the City which controls the methods and
procedures by which it liens properties.  To be sure, it is PGW
which developed the Lien Management System, including its
exceptions and blockers, it is PGW which determined when its
customers' debts would be deemed "lien eligible," and it is PGW
which decided when, where and how to send the pre-lien and post-
lien notices to Plaintiffs.  It is within PGW's province to make
changes to this system and in fact, it has done just that a
number of times since it was first activated in 2009.

     PGW likewise has control over how and when to make gas
service available to its customers and the means by which it
collects payments from its customers for that service.  Despite
being a regulated public utility whose activities are overseen by

the Public Utility Commission, there are many measures which PGW
could easily take to improve its customer collections and to
avoid the accumulation of large arrearages.  Examples of such
measures include: (1) the development of a dispute
resolution/grievance procedure such as that used by the City
Water Department and possibly utilizing the Philadelphia Gas
Commission as a final decisionmaker; (2) requiring a customer to
pay any outstanding bills in full on an old address before
agreeing to turn on gas service in that customer's name at a new
address; (3) developing and presenting all customers with an
authorization form permitting PGW to disclose confidential
customer information to the owner of the property where the gas
is being provided in the event of an account delinquency as a
pre-condition to obtaining gas service with PGW; and (4) Amending
its Tariff with the PUC to provide for such authorization to
landlords in the event a customer account reaches a designated
monetary threshold or is overdue by a designated number of
months.  While Plaintiffs could also easily include an
authorization form for their tenants to be signed concurrently
with and as a contingency for their leases, the remaining
suggested measures are within the ambit of PGW alone.

     Finally, it is and has been entirely within the City's
discretion to determine whether those landlords who have
registered with the Landlord Cooperation Program are in fact
"fully cooperative."  If not, and as the record in this matter

has amply demonstrated, those landlords are promptly marked "uncooperative," and their properties then immediately become "lien eligible" once again.  We certainly applaud PGW for creating the LCP and recognize the benefits which it confers. However, again, in the event that a landlord is deemed to be uncooperative, the record reflects that the notice which they receive of this designation is often unreliable and the only avenue for appeal is by challenging it informally with Mr. Rosario.  Mr. Rosario, in turn, has discretion to determine whether or not to re-admit an "uncooperative" landlord to the program but in the interim, any lien protection afforded by the program has been lost.  From all of this, we conclude that the granting of a permanent injunction would result in significantly less harm to the City as the non-moving party than Plaintiffs would suffer by its denial.

Regarding the last factor, we also find the issuance of permanent injunctive relief in this case to be in the public interest.  This case is one of constitutional dimension with consequences that reach across a large class of landlords which we have surmised is in excess of 40,000.  "Surely, upholding constitutional rights serves the public interest."  Newsom v. Albemarle County School Board, 354 F.3d 249, 261 (4th Cir. 2003); Exodus Refugee Immigration, Inc. v. Pence, 165 F. Supp. 3d 718, 742 (S.D. Ind. 2016).  Insofar as the City has made clear that in the absence of a direct mandate, it will make no changes to its

system of liening non-customer property owners for the long-unpaid debts of their tenants, we find that the entry of a permanent injunction is necessary, appropriate and in the public interest.

In view of all of the preceding, we now enter the following:

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §1331 and §1343.

2.  The methods and procedures currently being followed by the City of Philadelphia and its gas utility, Philadelphia Gas Works, for placing municipal liens on realty for its customers' unpaid gas bills constitute a taking of property without due process of law in violation of the 14th Amendment to the U.S. Constitution when the real estate being liened belongs to someone or some entity other than the holder of the delinquent gas account.

3.  Plaintiffs are currently suffering irreparable harm in that Defendant's current liening practices do not afford them any opportunity to address tenant delinquencies or mitigate accumulating arrearages in a meaningful time and in a meaningful manner and so as to prevent arrearages from causing their properties to be "lien eligible."  Plaintiffs also stand to suffer irreparable harm in the event that Defendant should elect to begin taking affirmative steps to collect on its liens by,

*inter alia*, forcing liened properties to be sold.

4.  In the absence of a court order, Defendant will continue to violate the Plaintiffs' constitutional rights by continuing to utilize its current liening practices.

5.  Although Defendant and all of its gas service customers would suffer harm in the event it is permanently enjoined from employing its current liening procedures, that harm would be temporary and is not irreparable.  Defendant is free to develop new methods and procedures for placing gas liens on real estate pursuant to the Pennsylvania Municipal Claim and Tax Lien Law, 53 P.S. §7101, *et. seq.* which satisfy the constraints of Constitutional due process and may thereafter resume liening.

6.  The balance of harms weigh in favor of Plaintiffs in that the granting of a permanent injunction would result in significantly less harm to the City as the non-moving party than Plaintiffs would suffer by its denial.

7.  The public interest is always served when the dictates of the United States Constitution are followed and constitutional rights are vindicated.  The public interest is thus served here by permanently enjoining the City of Philadelphia from continuing to violate the rights of a large number of its property owners.

8.  The extreme remedy of a permanent injunction is warranted in this case.

An Order follows.